**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARJORIE CASSIDY, | Case No. CV 15-3947 SS |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Marjorie Cassidy ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner" or the "Agency") denying her Disability Insurance Benefits. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for Title II Disability Insurance Benefits ("DIB") on June 3, 2011. (Administrative Record ("AR") 159-65; see generally Compl. for Rev. ("Compl.") 1-3, Dkt. No. 1). Plaintiff alleged a disability onset date of July 8, 2008. (AR 159). The Agency denied Plaintiff's application on August 5, 2011 (AR 92), and upon reconsideration on March 29, 2012. (AR 94). On May 17, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 102-03). Plaintiff, represented by David T. Holzman, testified before ALJ Mary L. Everstine on May 13, 2013 (the "hearing"). (AR 78-91). The ALJ continued the hearing to allow Plaintiff to submit additional medical records from her treating physician. Plaintiff, represented by Mr. Holzman, again testified before ALJ Everstine on September 16, 2013. (AR 52-67). The ALJ also heard the testimony of Vocational Expert ("VE") Sharon Spaventa. (AR 67-77).

The ALJ issued an unfavorable decision on September 27, 2013. (AR 14-24). Plaintiff filed a timely request for review with the Appeals Council on November 22, 2013 (AR 7-8), which the Council denied on April 22, 2015 (AR 1-3). Plaintiff filed the instant action on May 26, 2015. (Compl. 1-3).

\\

\\

\\

### III.

### FACTUAL BACKGROUND

Plaintiff was born on March 16, 1962. (AR 159). She was 46 years old as of the alleged disability onset date of July 8, 2008. (AR 159). She was 51 years old when she appeared before the ALJ. (AR 52, 81). Plaintiff completed the twelfth grade. In a psychological evaluation, it was reported that Plaintiff attended college part time, graduating with three Associate of Science degrees in 2003. (AR 507). In an earlier statement by Plaintiff, it was indicated that she graduated in 2004 from Allen Hancock College with a degree in Early Childhood Education. (AR 177). Prior to her alleged disability onset date, Plaintiff worked as a crossing guard for a school, weigh master at a gravel company, a deli clerk at a Vons grocery store, a lunch cook at a school district, and a part-time store clerk at The Little Store. (AR 177, 196-201, 229-234). Plaintiff also volunteered at local school literacy programs. (AR 206). She alleges that digestive problems, uncontrollable bowel movements, abdominal pain and nausea render her unable to work. (AR 202). She also testified at the hearing before the ALJ that her constipation and diarrhea require her to frequently use the restroom throughout the day for varying durations of time. (AR 83-84).

\\
\\
\\
\\
\\

3

**A.    Plaintiff's Medical History**

       **1.    Dr. Bruce F. Mize**

       Gastroenterologist Bruce F. Mize, M.D., evaluated Plaintiff beginning in 2006 for abdominal pain, weight loss, and sporadic diarrhea.  (AR 284).  The record includes an office note from Dr. Mize dated July 20, 2007 describing his treatment of Plaintiff and Plaintiff's medical history.  (AR 282-285).  Plaintiff's appendix ruptured at age 7, which likely caused extensive pelvic adhesions that were discovered during a supracervical hysterectomy in May 2005.  (AR 284).  Dr. Mize attempted a colonoscopy on February 1, 2006, but was unable to complete the procedure because of "extreme rigid fixation of the sigmoid colon within the pelvis as a result of these adhesions." (AR 284).  An esophagogastro-duodenoscopy with small bowel biopsy performed on April 7, 2006, showed no evidence of celiac sprue.  (AR 284).  Dr. Mize obtained small bowel series on May 17, 2006, which was normal.  (AR 284).

       On July 20, 2007, Plaintiff reported having a bowel movement once or twice per day and a 7-pound weight gain since her 2006 evaluation.  (AR 284).  Dr. Mize diagnosed Plaintiff with "[r]ecurrent abdominal pain syndrome, most likely secondary to irritable bowel with significant contribution by known extensive pelvic adhesions."  (AR 285).  Dr. Mize recommended that Plaintiff use a fiber preparation to manage her chronic bowel issues.  (AR 285).

1    Plaintiff returned to Dr. Mize on January 29, 2010,
2    complaining of constipation, obstipation, and varying stool
3    caliber.  (AR 280).  Plaintiff reported not being on any bowel
4    program except for occasional milk of magnesia.  (AR 280).
5    Plaintiff declined Dr. Mize's suggestion to undergo
6    proctosigmoidoscopy and subsequent virtual colonoscopy as an
7    alternative to colonoscopy.  (AR 280).  Dr. Mize noted that
8    Plaintiff had gained 16 pounds since first seeing him in 2006.
9    (AR 280).  Dr. Mize advised Plaintiff that she should be on a
10   regular bowel program, including daily Miralax.  (AR 281).  Dr.
11   Mize also advised Plaintiff that the only definitive procedure to
12   resolve her bowel issues would be surgery, which he did not
13   recommend except in the case of a complete obstruction.  (AR
14   281).

15

16       **3.   Dr. Kerri Wiltchik**

17

18       Gynecologist Kerri Wiltchik, M.D., performed the
19   supracervical hysterectomy on Plaintiff in May 2005 and the
20   record contains Dr. Wiltchik's subsequent treatment notes from
21   2007 through 2010.  (AR 286-304).  On June 22, 2007, Plaintiff
22   complained of weight loss and diffuse abdominal pain.  (AR 303).
23   Dr. Wiltchik determined that Plaintiff's weight loss and
24   abdominal pain were not gynecologic in nature and suggested
25   consulting with a gastroenterologist.  (AR 304).  Dr. Wiltchik
26   also recommended trying an anti-depressant, which Plaintiff
27   declined.  (AR 304).  It was recommended that Plaintiff decrease
28   her daily smoking.  (AR 295).

5

1      Although Plaintiff saw Dr. Wiltchik primarily for
2   gynecological issues, Plaintiff also regularly reported on her
3   abdominal symptoms.  On August 21, 2009, Plaintiff again reported
4   abdominal pain and decreased appetite.  (AR 295).  On February 2,
5   2010, Plaintiff reported that she was feeling well.  (AR 292).
6   On September 27, 2010, Plaintiff's rectal exam was normal.  (AR
7   290).  On November 15, 2010, Plaintiff complained of abdominal
8   pain with occasional cramping.  (AR 286).  She also stated that
9   she became sick two weeks prior with vomiting and blood in her
10  stool.  (AR 286).  Dr. Wiltchik again referred Plaintiff to a
11  gastroenterologist.  (AR 287).

12

13      **3.   Dr. Richard Zachrich**

14

15      Dr. Richard Zachrich is Plaintiff's primary care physician.
16  Dr. Zachrich's earliest treatment notes in the record are dated
17  December 4, 2007, and note that Plaintiff was "working at the
18  deli at Vons (AR 433); exhibited normal activity and energy
19  level; Dr. Zachrich encouraged Plaintiff to stop smoking (AR
20  434); no change in appetite; normal memory; and a weight gain of
21  6 pounds since their last appointment.  (AR 433-434).

22

23      On April 2, 2008, Plaintiff reported that her abdominal
24  symptoms had "been good," and although her weight was "down a
25  couple of pounds," she "overall is doing much better."  (AR 426).
26  Plaintiff continued to work at "the deli at Vons."  (AR 426).
27  Her tobacco use was reported as "Currently smokes ½ PPD, has
28  smoked for 20 to 25 years."  (AR 426).  The note reports that

6

"the patient exercises daily." (AR 426).   Although the cause of Plaintiff's weight loss was unknown, Dr. Zachrich noted that "[Plaintiff's] weight in general has been fairly stable and certainly up compared to what it was two years ago." (AR 427). On June 11, 2008, Plaintiff reported that "[o]verall she feels she is doing well" and "is pleased with her weight being up" since she has "been trying to watch her diet better." (AR 422). On October 14, 2008, Plaintiff again reported that "[o]verall she feels she is doing well," and Dr. Zachrich noted no abdominal pain, diarrhea, or constipation.   (AR 419).   The doctor noted "Her smoking is down to one quarter pack a day.  I congratulated her on that. I urged her to continue." (AR 419).   The note reported Plaintiff was "Working at the deli at Vons" and "exercises daily." (AR 419).

   On March 3, 2009, Plaintiff reported that she "still occasionally gets the abdominal pain," for which she once took tramadol, but that her weight had been stable.  (AR 413).   The note reports that Plaintiff is "working at the Deli at Vons" and "exercises daily." (AR 413).   The note reports "normal activity and energy level, no change in appetite.   No major weight gain or loss." (Id.).   In addressing abdominal pain, the doctor noted "Still with intermittent symptoms although clearly much better than they had been." (AR 414).

   On August 18, 2009, Plaintiff stated that she experienced significant stress and anxiety when her mother-in-law died, but reported no abdominal pain or bowel issues. (AR 406).   On

7

1  December 18, 2009, Plaintiff reported that "[o]verall she feels
2  like she's doing fairly well" but that her bowels had "become
3  more difficult again" with constipation. (AR 401-402). Dr.
4  Zachrich referred Plaintiff to a GI specialist to consider
5  whether or not a colonoscopy should be done. (AR 402).
6  Nonetheless, he also reported that Plaintiff had "normal activity
7  and energy level, no change in appetite." (AR 406). In
8  assessing her abdominal pain, the doctor wrote "Abdominal
9  symptoms [have] been (sic) better recently." (AR 407).

10

11      On January 26, 2010, Plaintiff did not report any abdominal
12  symptoms, although she had appointment set up with a GI doctor.
13  (AR 388-389). Her doctor continued to counsel her to stop
14  smoking. (AR 389). On April 20, 2010, Plaintiff reported to Dr.
15  Zachrich that the GI specialist, Dr. Mize, said a second
16  colonoscopy attempt would be futile. (AR 371). Plaintiff also
17  complained of rectal bleeding. (AR 371). Dr. Zachrich had no
18  follow up for her abdominal symptoms at the time. (AR 373). On
19  July 28, 2010, Dr. Zachrich noted that Plaintiff's weight was up
20  from what it was a year ago and she was tolerating her
21  medications without any side effects. (AR 365). Plaintiff
22  reported that her abdominal symptoms "have not been bothering her
23  as much recently." (AR 366). On October 27, 2010, Plaintiff
24  reported doing well in general, that her GI symptoms were stable,
25  and that she was able to maintain a healthy weight. (AR 359).

26

27      On November 17, 2010, Plaintiff complained of diarrhea and
28  cramping following a flu vaccine and meal of Chinese food. (AR

1   348).  Plaintiff stated it felt like there was a blockage.  (AR

2   348).  Dr. Zachrich suspected that Plaintiff's abdominal symptoms

3   were more likely due to a virus than to the flu vaccine.  (AR

4   349).  Although Dr. Zachrich did not find blood in Plaintiff's

5   stool, he was concerned about its black color and ordered stool

6   cards and cultures.  (AR 349).  Dr. Zachrich again referred

7   Plaintiff to a GI specialist.  (AR 349).  On November 19, 2010,

8   Plaintiff called Dr. Zachrich's office, stating that she is

9   eating and "doing ok," but it is "not fun at all" when she has a

10  bowel movement.  (AR 344).  Dr. Zachrich's notes dated November

11  24, 2010, indicate that Plaintiff's stool cultures were all

12  negative and recommended daily Miralax to address her

13  constipation while she waited to see the GI specialist.  (AR

14  339).  Dr. Zachrich's notes dated December 7, 2010 indicate that

15  Plaintiff was having daily, "easy" bowel movements since starting

16  Miralax.  (AR 337).

17

18      On February 7, 2011, Plaintiff reported that she continued

19  to struggle with her abdominal issues, which she thought were

20  worsening over the years.  (AR 335).  Dr. Zachrich believed these

21  issues were related to her pelvic adhesions, and referred

22  Plaintiff to a GI specialist for follow up.  (AR 336).  Plaintiff

23  felt that her current specialist, Dr. Mize, did not have anything

24  to offer her so Dr. Zachrich recommended going to one of the

25  partners in his practice.  (AR 335).  His notes reflect that, as

26  of February 7, 2011, Plaintiff continued "working at the deli at

27  Vons."  (AR 335).  He reported that Plaintiff "continues to smoke

28  about two thirds of a pack a day" and he encouraged her to stop

9

1    smoking.  (AR 335).  Under "systems", the doctor reported "normal

2    activity and energy level, no change in appetite.   No major

3    weight gain or loss."  (AR 335).   Under "pain abdominal", he

4    wrote "systems persist.  I suspect this is an issue predominately

5    with scar tissue.  Referral back to GI to see if any additional

6    workup should be considered."  (AR 336).

7

8        On May 24, 2011, Plaintiff reported that the new GI

9    specialist, Dr. Nastaskin, prescribed new medication, which was

10   effective but cost prohibitive, so she switched back to Miralax.

11   (AR 328).   Plaintiff reported that she experienced "3 bad

12   episodes" since February, but "they are better than what they

13   were previously."  (AR 328).   Plaintiff also asked if Dr.

14   Zachrich would support her disability claim, which he said he

15   would "be okay with."  (AR 328).   Dr. Zachrich noted that

16   "[a]bdominal symptoms continue although the severity and length

17   of the symptoms seem to be improved.  I would however agree that

18   employment would be difficult for her at this time.  Plan:  I've

19   asked her to get a hold of disability paperwork and we'll go

20   ahead and fill out."  (AR 329).  Under "Occupation," the doctor

21   wrote "not currently working."  Under "systems," he wrote "normal

22   activity and energy level, no change in appetite.   No major

23   weight gain or loss."  (AR 328).

24

25       On November 16, 2012, Plaintiff reported problems with

26   constipation that "completely resolved" with over-the-counter

27   medication.   (AR 502).  Dr. Zachrich noted that Plaintiff's

28   weight was stable and she was tolerating her medication without

any side effects. (AR 502). He reported that Plaintiff "still is not decided whether to proceed with colonoscopy. Plan: Encourage." (AR 503). Under "tobacco use disorder", the doctor wrote "Encouraged her to stop." (AR 503).

On March 21, 2013, Plaintiff reported that she was doing well and tolerating medication with no side effects. (AR 496). Dr. Zachrich encouraged Plaintiff to proceed with a colonoscopy. (AR 497).

Over the course of treating Plaintiff for seven years, Dr. Zachrich consistently noted Plaintiff's healthy appearance, normal activity and energy levels, daily exercise, appropriate judgment, and normal memory. (AR 328-329, 335-336, 348-349, 359-360, 365-366, 371-372, 388-389, 401-402, 406-407, 413-414, 419-420, 422-423, 426-427, 433-434, 496-497, 502-503). Plaintiff also consistently denied significant alcohol use. (AR 328, 335, 348, 359, 365, 371, 388, 401, 406, 413, 419, 422, 426, 433).

### 4.  Dr. Igor J. Nastaskin

Plaintiff saw gastroenterologist Igor J. Nastaskin, M.D. at the referral of Dr. Zachrich. (AR 322, 335). On February 24, 2011, Plaintiff reported that her "symptoms spontaneously improved," she "occasionally gets cramping," and that having a bowel movement "sometimes triggers the discomfort." (AR 321). Dr. Nastaskin performed a 14-point review of systems and found that there was "no definite treatment" available for Plaintiff's

chronic symptoms, but that Amitiza or Miralax could regulate her bowel movements and "[o]verall, the GI symptoms globally improved since November of last year." (AR 322).

On August 4, 2011, Plaintiff saw Dr. Nastaskin for complaints of constipation and abdominal pain. (AR 319). Plaintiff reported "doing well" overall and that she had better control over her symptoms after making certain dietary changes. (AR 319). Plaintiff reported that using stool softeners and Miralax resolved her constipation. (AR 319). Dr. Nastaskin concluded that "[o]verall, symptoms are very manageable" and use of fiber and Miralax effectively addressed Plaintiff's constipation. (AR 320). Dr. Nastaskin suggested the option of a cholecystectomy, but Plaintiff declined because her symptoms were manageable. (AR 320). Dr. Nastaskin recommended continued use of fiber and Miralax as needed. (AR 320).

**B.   Consultative Opinions**

    **1.   Dr. Ursula Taylor**

Plaintiff saw Dr. Ursula Taylor, who is Board Eligible for Internal Medicine, for an independent internal medicine evaluation on August 27, 2011. (AR 323-327). Plaintiff's chief complaint was for back and joint pain, but she also mentioned her bowel problems, abdominal pain and cramps that she claimed were not improved by medication. (AR 323). Plaintiff reported that she was currently taking Miralax. (AR 323). A mental status

examination revealed adequate memory and orientation. (AR 324).
Dr. Taylor noted a "very strong smell of alcohol" and older
appearance than Plaintiff's stated age. (AR 324). Dr. Taylor
later wrote: "[Plaintiff] did have a very strong alcoholic breath
and also appeared much older appearing than stated age with
extensive wrinkles especially noticeable on the face suggestive
of long-term alcohol use. This claimant most likely is
significantly alcohol dependent." (AR 326). Dr. Taylor noted
that Plaintiff "did not have any abdominal findings." (AR 326).
Dr. Taylor opined that Plaintiff did not have any lifting,
carrying, sitting, or standing limitations, but suggested that
Plaintiff not "work at heights or climb ladders due to probable
alcohol ingestion" and "not drive or operate moving machinery due
to probable alcohol ingestion." (AR 326-327).

   **2.   Dr. Roger A. Izzi**

     Plaintiff saw Dr. Roger A. Izzi for a psychiatric evaluation
on February 26, 2012. (AR 448-451). Plaintiff complained that
she felt "frustrated" and "useless" because of her digestive
issues and painful bowel movements. (AR 448). Plaintiff
reported doing light yard work, laundry, food preparation, and
occasionally seeing friends. (AR 448). Plaintiff also reported
sleeping difficulties because she frequently needed to go to the
bathroom. (AR 448). Plaintiff did not report taking Miralax or
any other laxative at that time. (AR 449). Dr. Izzi
administered a Folstein Mini Mental Status Examination, which
noted dysphoric affect but overall performance in the normal

range with intact cognitive functioning.  (AR 449-450).  Dr. Izzi opined that Plaintiff was capable of performing simple and repetitive tasks on a consistent basis over an 8-hour period, and mood fluctuation would limit her ability to perform complex tasks over an 8-hour period.  (AR 451).

**3.   Dr. Michael A. Errico**

Plaintiff saw Dr. Michael A. Errico for a psychological evaluation on September 13, 2013.  (AR 506-515).  A "Mr. Holtzman," who appears to be a social security attorney, referred Plaintiff to Dr. Errico.  (AR 517).  Plaintiff complained that her bowel problems "cause pain and so much discomfort, blockage and then explosive bouts of diarrhea," which led to feelings of uselessness and despair.  (AR 506).  Plaintiff described her typical day as consisting of feeding her pets, watching television, doing chores around the house, doing yard work, visiting with neighbors, sitting outside and listening to music, and taking her brother-in-law to mental health appointments every other week.  (AR 507-508).  Plaintiff noted that she had been diagnosed with a learning disability.  (AR 507).  Plaintiff did not indicate that she was taking any prescription medication for her abdominal issues.  (AR 508).

Dr. Errico administered a battery of psychological tests to measure Plaintiff's intellectual functioning, susceptibility to stress-related illness, subjective experience of pain, episodes of depression and anxiety, and ability to function in a variety

of tasks.  (AR 508-510).  Computation of the Abstraction Quotient yielded a score of 106, which Dr. Errico noted "argues against significant intellectual impairment."  (AR 508).  Dr. Errico opined that "[c]linically [Plaintiff's] intelligence seems to be in the normal range" and he "found no evidence of significant intellectual impairment."  (AR 509).  Dr. Errico observed that Plaintiff's GI symptoms are likely exacerbated by stress.  (AR 509).  Plaintiff reported that certain foods make her abdominal pain worse.  (AR 509).  Dr. Errico rated Plaintiff's depression and anxiety both in the moderate range.  (AR 509-510). Plaintiff's responses to the Functional Abilities Questionnaire indicate that she cannot perform tasks that require careful attention to detail under pressure, and she can remember verbal instructions if she does not have to perform them in a specific order.  (AR 510).  Plaintiff also reported problems with short term memory.  (AR 511).

Dr. Errico diagnosed Plaintiff with pain disorder due to abdominal adhesions exacerbated by stress, a single episode of moderate depression, and anxiety disorder NOS.  (AR 512).  Dr. Errico opined that:

> [Plaintiff's] ability to understand, remember and carry
> out an extensive variety of technical and/or complex
> job instructions is markedly limited by the
> interference if [sic] her physical symptoms, and
> chronic pain, and anxiety with energy, memory,
> attention, and concentration.  I believe that her

ability to understand, remember and carry out simple one or two step job instructions would be only mildly limited by the same factors described above. I believe that her ability to deal with the public is moderately limited by her mood disorder, i.e. depression, and by anxiety and irritability. I believe that her ability to maintain concentration and attention for at least two hour increment [sic] is moderately limited by the interference of her physical symptoms, and also by the interference of chronic pain with energy, memory, attention and concentration. I believe that her ability to withstand the stress and pressures associated with an eight-hour work day and day to day work activities is markedly limited by the unpredictability to [sic] her physical symptoms[. . .] Please also see the report of Dr. Zachrich in regard to the impact of stress on her symptoms.

(AR 514-515).

C.   **Psychiatric Review Forms**

1.   **Dr. Deborah Hartley**

On July 22, 2011, reviewing psychologist Dr. Deborah Hartley completed a Psychiatric Review Technique form assessing Plaintiff's mental impairments. (AR 305-318). Dr. Harley opined that Plaintiff had "no specific mental barrier to personal care,

preparing meals, driving, using public transportation, shopping, managing money, socializing or following instructions" but that she "needs … encouragement for household chores." (AR 317).

### 2.   Dr. Thomas Van Hoose

On March 20, 2012, psychologist Dr. Thomas Van Hoose completed a Psychiatric Review Technique form assessing Plaintiff's mental impairments. (AR 456-469). Dr. Van Hoose indicated that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace and mild difficulties in maintaining social functioning. (AR 466). Dr. Van Hoose noted that Dr. Izzi's opinion that Plaintiff could perform simple, repetitive tasks was congruent with Plaintiff's functional and activity reports. (AR 468). Dr. Van Hoose's functional capacity assessment concluded that Plaintiff "appears able to perform simple repetitive work-like tasks with normal supervision and public contact." (AR 454).

### D.   <u>Vocational Expert Testimony</u>

Vocational Expert ("VE") Sharon Spaventa testified at Plaintiff's hearing before the ALJ. (AR 67-77). The VE testified that a hypothetical individual with Plaintiff's education and work experience who was limited to simple, repetitive tasks and required access to a restroom during routine work breaks could perform Plaintiff's past work as a weigh master at a gravel company. (AR 67-68). The VE also testified that

17

taking additional bathroom breaks for up to 15 to 30 minutes would be disruptive to the job of weigh master. (AR 68-69). In response to the ALJ's question whether there were other jobs performed at the light or medium exertional level that could accommodate more frequent absences, the VE testified that such jobs would include housekeeper, retail marker, and janitor. (AR 69-70). These jobs would allow the individual to work independently and have more flexibility for random bathroom breaks. (AR 70, 74-75). The VE clarified that these more frequent absences beyond routine breaks could not exceed 10 percent of the work day on a continual basis. (AR 69-70, 75-76). However, the ultimate test would be whether the individual could get the job done and not the precise amount of time spent on bathroom breaks. (AR 70). The VE testified that to the extent her opinions went beyond the descriptions included in the Dictionary of Occupational Titles ("DOT"), they were based on her experience, education, and discussion with peers regarding the issues. (AR 71).

E. **Plaintiff's Testimony**

Plaintiff testified that she was unable to work because her bowel problems required her to frequently use the restroom for varying amounts of time throughout the work day. (AR 53-54, 83-84). Specifically, she would have to use the restroom four to six times a day for 15 to 45 minutes at a time and experience fatigue after bowel movements. (AR 53-54, 84). When she worked part-time at the Little Store, she would often lock the store so

18

she could have a bowel movement, which would take up to 30 minutes to complete. (AR 60-61). Two to four times a week Plaintiff would squat over a paper plate in the bathroom to have a bowel movement because squatting was more comfortable than sitting on the toilet. (AR 64-65). When the ALJ noted that Dr. Zachrich's treatment records did not reflect episodes as frequently as Plaintiff suggested and that her symptoms were under good control, she responded that Dr. Zachrich "doesn't care about those problems." (AR 56). Plaintiff testified that taking Miralax helped reduce her symptoms, but caused anal leakage. (AR 55).

Plaintiff testified that she had difficulty sleeping at night because of having to get up and use the restroom and she would nap during the day for two to eight hours. (AR 55). Plaintiff also testified that she did chores around the house, took her brother-in-law to mental health appointments, took care of her pets, and could lift 20 pounds occasionally. (AR 57-58). In an Adult Function Report dated July 13, 2011, Plaintiff indicated that she was "pretty good" at following spoken instructions and she would "skim over or look for picture [and] try to follow" written instructions. (AR 207).

**F.    Third Party Function Report**

Plaintiff's husband, Rick Cassidy, submitted a Third Party Function Report dated December 28, 2011 in support of Plaintiff's application for benefits. (AR 219-228). In this report, Mr.

Cassidy stated that Plaintiff was unable to work because she was undependable and could no longer keep a schedule because of her illness. (AR 220-221). He also stated that Plaintiff's abdominal pain frequently interrupted her sleep and she would often stay in bed all day. (AR 221). Mr. Cassidy stated that Plaintiff would care for their pets, cook her meals, perform household and outdoor chores on an inconsistent basis, shop for food, watch television and listen to music, and occasionally socialize with friends or family. (AR 220-225). He indicated that Plaintiff's illness affected her ability to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use her hands, bend, talk, complete tasks, and get along with others, but that she had average ability to follow written and spoken instructions. (AR 225-226).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is disabled and therefore entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4)  Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

(5)  Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

\\

\\

1 | <u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>,

2 | 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20

3 | C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

4 |

5 |      The claimant has the burden of proof at steps one through

6 | four, and the Commissioner has the burden of proof at step five.

7 | <u>Bustamante</u>, 262 F.3d at 953-54.   Additionally, the ALJ has an

8 | affirmative duty to assist the claimant in developing the record

9 | at every step of the inquiry.   <u>Id.</u> at 954.   If, at step four, the

10 | claimant meets her burden of establishing an inability to perform

11 | past work, the Commissioner must show that the claimant can

12 | perform some other work that exists in "significant numbers" in

13 | the national economy, taking into account the claimant's residual

14 | functional capacity ("RFC"), age, education, and work experience.

15 | <u>Tackett</u>, 180 F.3d at 1100; <u>see</u> <u>Reddick</u>, 157 F.3d at 721; <u>see also</u>

16 | 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).   The Commissioner may

17 | do so by the testimony of a vocational expert or by reference to

18 | the Medical-Vocational Guidelines appearing in 20 C.F.R. Part

19 | 404, Subpart P, Appendix 2 (commonly known as "the Grids").

20 | <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).   When a

21 | claimant has both exertional (strength-related) and non-

22 | exertional limitations, the Grids are inapplicable and the ALJ

23 | must take the testimony of a vocational expert.   <u>Moore v. Apfel</u>,

24 | 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856

25 | F.2d 1335, 1340 (9th Cir. 1988)).

26 | \\

27 | \\

28 | \\

22

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from July 8, 2008, through the date of the ALJ's decision on September 27, 2013. (See AR 14-24).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since July 8, 2008. (AR 16).  At step two, the ALJ found that Plaintiff had three "severe" impairments:   chronic constipation; history of pelvic adhesions; and depression.  (AR 16-19).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (AR 19-20).  The ALJ then found that Plaintiff had the following RFC:

> [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no greater than simple repetitive tasks in an environment allowing access to a restroom during routine breaks; and limitations related to alcohol use.

(AR 20).

\\

\\

In making this finding, the ALJ gave the greatest persuasive weight to the opinions of gastroenterology specialist Dr. Nastaskin regarding Plaintiff's abdominal complaints. (AR 20-21). The ALJ noted that Dr. Nastaskin was a specialist in the specific area of the alleged disability. (AR 20). The ALJ also emphasized that Dr. Nastaskin's opinion that Plaintiff's symptoms were "very manageable" was consistent with the medical consensus that Plaintiff's symptoms were controllable with prescribed medication and did not reach a disabling degree of severity. (AR 20). Plaintiff acknowledged to Dr. Nastaskin that she had better control of her symptoms by making dietary changes and consistently taking Miralax. (AR 20). This improvement and good control was corroborated by Dr. Zachrich's treatment notes. (AR 21).

The ALJ also gave persuasive weight to the opinions of consultative internal medicine examiner Dr. Taylor and psychologist Dr. Errico. (AR 20). Specifically, the ALJ found Dr. Errico's opinion to be persuasive in establishing that Plaintiff was capable of performing simple and repetitive tasks on a sustained basis. (AR 21).

In contrast, the ALJ assigned little weight to Dr. Zachrich's opinion that Plaintiff was precluded from any employment because it was not well supported by the record and internally inconsistent. (AR 21). Although Dr. Zachrich opined that Plaintiff's need to use the bathroom on a frequent basis precluded employment, the VE testified that there were jobs in

1  the economy that Plaintiff could perform allowing for more
2  frequent bathroom breaks outside of routine work breaks. (AR
3  21).

4

5      Additionally, the ALJ weighed Plaintiff's testimony as to
6  her symptoms, limitations and daily activities, concluding that
7  Plaintiff's testimony was not entirely credible. (AR 21-22).
8  The ALJ noted that claimant was able to exercise daily, perform
9  light yard work, do her laundry, prepare meals, do dishes, take
10 care of her pets, perform household chores, visit with friends,
11 and take her brother-in-law to his mental health appointments.
12 (AR 22). The ALJ stated that these activities were generally
13 inconsistent with disability and consistent with the ability to
14 perform at least limited work. (AR 22). The ALJ also noted that
15 while Plaintiff testified at the hearing that she stopped using
16 Miralax because of side effects of anal leakage, the medical
17 records indicate that she was pleased with the results of her
18 medication and fail to document her report of alleged side
19 effects. (AR 22). Finally, the ALJ noted that the Plaintiff's
20 symptoms were manageable with limited and conservative treatment.
21 (AR 22).

22

23     At step four, the ALJ determined that Plaintiff may be able
24 to perform her past relevant work as a weigh master. (AR 23).
25 Although the first hypothetical only allowed for access to the
26 restroom during routine breaks, the VE testified that if an
27 individual had to be absent outside of normal breaks, work as a
28 weigh master would likely be precluded. (AR 23). Accordingly,

the ALJ concluded that Plaintiff may or may not be able to perform past relevant work.  (AR 23).

At step five, the ALJ determined that Plaintiff could perform other jobs that exist in significant numbers in the national economy.  (AR 23).  Specifically, the ALJ determined that Plaintiff could perform work as a housekeeper, retail marker, and janitor because they would accommodate more flexibility with restroom breaks as long as the individual was not off task more than 10 percent of the workday.  (AR 23-24).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)).  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  Reddick, 157 F.3d at 720 (citing

1  Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To

2  determine whether substantial evidence supports a finding, the

3  court must "'consider the record as a whole, weighing both

4  evidence that supports and evidence that detracts from the

5  [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035

6  (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If

7  the evidence can reasonably support either affirming or reversing

8  that conclusion, the court may not substitute its judgment for

9  that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing

10 Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

11

12                              **VII.**

13                           **DISCUSSION**

14

15     Plaintiff challenges the ALJ's decision on four grounds.

16 First, Plaintiff contends that the ALJ's RFC finding is

17 incomplete because it fails to account for all of Plaintiff's

18 mental and physical impairments, rendering the ALJ's step four

19 and step five determinations invalid. (Pl.'s Mem. in Supp. of

20 Compl. ("Pl.'s Mem.") at 2-13, Dkt. No. 12). Second, Plaintiff

21 contends that the ALJ improperly rejected the opinions of

22 Plaintiff's treating physician, Dr. Zachrich. (Id. at 13-15).

23 Third, Plaintiff contends that the ALJ improperly failed to

24 assess the third-party written testimony. (Id. at 15-17).

25 Fourth, Plaintiff contends that the ALJ improperly discredited

26 Plaintiff's testimony. (Id. at 17-24).

27 \\

28 \\

                                27

The Court disagrees with all four contentions. The record demonstrates that the ALJ appropriately assessed Plaintiff's RFC, gave proper weight to Dr. Zachrich's opinions, the third party testimony was not material to the disability determination, and conducted a thorough and proper analysis of Plaintiff's testimony and allegations. Accordingly, for the reasons discussed below, the Court finds that the ALJ's decision must be AFFIRMED.

## A.   Substantial Evidence Supports The ALJ's RFC Determination

Plaintiff claims that the ALJ's RFC determination is incomplete because it fails to account for all limitations stemming from Plaintiff's mental and physical impairments. Specifically, Plaintiff contends that the RFC fails to include Plaintiff's moderate difficulties with concentration, persistence or pace; fails to include meaningful limitations related to Plaintiff's need for frequent bathroom breaks; and fails to define "limitations related to alcohol use." (Pl.'s Mem. at 2-13).

At step four of the sequential process, the ALJ must make a threshold determination as to the claimant's residual functional capacity ("RFC"). This determination is not a medical opinion but instead an administrative finding reached after consideration of all the relevant evidence, including the diagnoses, treatment, observations, medical records, and the Plaintiff's own subjective symptoms. See 20 C.F.R. § 404.1527 (e)(2). The RFC is what a claimant can still do despite existing exertional and

1  nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1);

2  Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 689 (9th

3  Cir. 2009). In assessing RFC, the ALJ must consider all of the

4  limitations imposed by the claimant's impairments that are

5  supported by medical evidence. Carmickle v. Comm'r, Soc. Sec.

6  Admin., 533 F.3d 1155, 1164 (9th Cir. 2008). Once the ALJ

7  determines the claimant's RFC, she then compares these

8  limitations with the job duties of the claimant's previous work.

9

10  Here, the ALJ found that plaintiff had the following RFC:

11

12  [C]laimant has the residual functional capacity to

13  perform a full range of work at all exertional levels

14  but with the following nonexertional limitations: no

15  greater than simple repetitive tasks in an environment

16  allowing access to a restroom during routine breaks;

17  and limitations related to alcohol use.

18

19  (AR 20).

20

21  **1.  Medical Evidence Shows That Plaintiff Can Perform At**

22  **All Exertional Levels**

23

24  Plaintiff's treating and examining physicians uniformly

25  found that Plaintiff did not have any exertional limitations.

26  Dr. Zachrich's treatment notes indicate that Plaintiff was

27  consistently negative for musculoskeletal or constitutional

28  impairments. (AR 328, 335-336, 348-349, 359-360, 365-366, 371-

1   373, 388-389, 401-402, 406-407, 413-414, 419-420, 422-423, 426-

2   427, 433-434, 496-497, 502-503).   Dr.   Taylor's   independent

3   internal medicine evaluation notes that Plaintiff "had full range

4   of  motion  of  the  lumbar  spine  and  cervical  neck  without  any

5   specific  limitations"  and  found  that  Plaintiff  "is  able  to  lift

6   and  carry  without  limitations."   (AR  326).   Plaintiff  does  not

7   dispute  the  ALJ's  finding  that  she  has  no  exertional  limitations.

8   Based  on  the  medical  evidence,  the  ALJ  reasonably  concluded  that

9   Plaintiff can perform work at all exertional levels.

10

11      2.   **The RFC Accurately Reflects Plaintiff's Nonexertional**

12           **Limitations**

13

14           a.   Simple, Repetitive Tasks

15

16      The  ALJ  found  the  psychological  evaluation  of  Dr.  Errico

17   "persuasive in establishing the claimant is capable of performing

18   simple  and  repetitive  tasks  on  a  sustained  basis."   (AR  21).

19   Plaintiff  argues  that  Dr.  Errico's  opinion  supports  more  specific

20   and  restrictive  functional  restrictions,  including  limitations

21   related  to  work  stress,  dealing  with  the  public,  and  difficulties

22   with  concentration,  persistence  or  pace.   (Pl.'s  Mem.  at  6-10).

23   Plaintiff  also  argues  that  the  ALJ  mischaracterized  Dr.  Errico's

24   opinions.  (Id. at 6-7).

25

26      The  ALJ's  finding  that  Plaintiff  is  capable  of  performing

27   simple,  repetitive  tasks  is  well  supported  by  the  record.   In  an

28   adult  function  report  dated  July  11,  2011,  Plaintiff  indicated

that she is "pretty good" at following spoken instructions and can follow written instructions with the aid of pictures. (AR 207). On July 22, 2011, reviewing psychologist Dr. Hartley opined that Plaintiff had "no specific mental barrier to . . . following instructions." (AR 317). In a third party adult function report dated December 28, 2011, Plaintiff's husband indicates that Plaintiff has average ability to follow written and spoken instructions. (AR 226).

On February 26, 2012, examining psychologist Dr. Izzi opined that Plaintiff was capable of performing simple and repetitive tasks on a consistent basis over an 8-hour period. (AR 451). On March 20, 2012, reviewing psychologist Dr. Van Hoose opined that Plaintiff "appears able to perform simple repetitive work-like tasks with normal supervision and public contact." (AR 454). Finally, on September 13, 2013, examining psychologist Dr. Errico opined that Plaintiff's physical and mental impairments markedly limited her ability to perform complex tasks, but only mildly limited her ability to understand, remember, and carry out simple one or two step job instructions. (AR 514-515). Dr. Errico also noted that Plaintiff's "ability to maintain concentration and attention for at least two hour increment [sic] is moderately limited by the interference of her physical symptoms, and also by the interference of chronic pain with energy, memory, attention and concentration." (AR 514-515).

Plaintiff argues that Dr. Errico's opinion that Plaintiff is moderately limited in maintaining concentration, persistence or

31

pace is not adequately captured by an RFC limiting Plaintiff to simple, repetitive tasks, and Plaintiff cites Brink v. Comm'r Soc. Sec. Admin., 343 F. App'x 211, 212 (9th Cir 2009) (RFC limiting claimant to simple, repetitive work did not capture functional limitations deriving from moderate difficulties in concentration, persistence or pace).    However, Dr. Errico specifically attributed Plaintiff's concentration and attention limitations to "interference of her physical symptoms." (AR 514-515).    In other words, Plaintiff's ability to concentrate and maintain attention for extended periods of time is limited by her need for frequent bathroom breaks, which is accounted for in the RFC.    (AR 16-19, 21-23).    In addition, substantial evidence exists in the record to demonstrate that her abdominal pain improved over time and her symptoms can be controlled by medications such as Miralax.  Dr. Errico does not attribute any distinct functional limitations to Plaintiff's difficulties in concentration, and no other psychological examiners or reviewers opine such limitations.    The only functional limitation related to Plaintiff's mental impairments consistently identified in the medical testimony is a limitation to simple, repetitive tasks. Therefore this case is more like Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008), because the properly credited medical testimony does not establish any distinct functional limitations in concentration, persistence, or pace.  See id. at 1174.

Plaintiff's argument that the RFC fails to account for Dr. Errico's opinion regarding work stress or public interaction limitations is similarly flawed.    Dr. Errico opined that

32

Plaintiff's inability to deal with work stress or interact with the public is related to her depression and physical symptoms, and that work stress can exacerbate her physical symptoms. (AR 514-515). However, no other psychological examiner or reviewer found similar limitations. Dr. Izzi noted Plaintiff's dysphoric affect but opined no related functional limitations (AR 451), and these findings conflict with years of Plaintiff's treating physician reporting "Judgment appropriate. Oriented. Normal memory. Mood and affect appropriate" and similar normal psychiatric findings. (AR 497 (2013) 502 (2012) ("negative for anxiety, depression and sadness") 329 (2011) 336 (2011) 349 (2010) 414 (2009)). Dr. Van Hoose found Plaintiff "able to perform simple repetitive work-like tasks with normal supervision and public contact." (AR 454). To the extent that the ALJ credited limitations related to work stress and public interaction, these limitations are accommodated by the RFC which allows Plaintiff to tend to her physical symptoms on a flexible, independent basis as long as it does not exceed 10 percent of the workday. (AR 23, 70).

Plaintiff suggests that the ALJ mischaracterized Dr. Errico's opinion by failing to find other functional limitations beyond Plaintiff's ability to perform simple, repetitive tasks. (Pl.'s Mem. at 4-9). Dr. Errico's opinion that Plaintiff is unable to perform complex tasks but <u>can</u> perform one or two step tasks is not necessarily inconsistent with a finding that Plaintiff can perform simple, repetitive tasks.[2] The ALJ

_____

[2] Furthermore, a person restricted to simple, repetitive tasks

1   reasonably interpreted Dr. Errico's opinion as finding Plaintiff

2   capable of performing simple, repetitive tasks.   A contrary

3   interpretation limiting Plaintiff to only one or two step tasks

4   _____

5   possesses the reasoning ability to perform the work the VE opined
    that Plaintiff would be capable of performing.   In Zavalan v.

6   Colvin, 778 F.3d 842 (9th Cir. 2015), the Ninth Circuit concluded
    that "there is an apparent conflict between the residual

7   functional capacity to perform simple, repetitive tasks, and the
    demands of Level 3 Reasoning." Id. at 847.   Many courts

8   following Zavalin have found that the performance of simple,
    repetitive tasks is consistent with "Level 2 Reasoning" -- the

9   ability to understand and carry out detailed but uninvolved
    written or oral instructions, as defined by the Dictionary of

10  Occupational Titles.   See, e.g., Hernandez v. Colvin, 2015 WL
    4730224, at *4 (E.D. Cal. Aug. 10, 2015) ("[T]here is a general

11  consensus within the Ninth Circuit and elsewhere that a
    limitation to simple and repetitive tasks is consistent with the

12  jobs requiring Level 2 Reasoning.") (citing cases) (appeal filed
    Oct. 9, 2015); Owens v. Colvin, 2015 WL 4112375, at *7 (D. Or.

13  July 7, 2015) ("[T]his Court concludes the limitation to 'simple,
    repetitive task work, not complex or detailed' in the ALJ's

14  assessment of Plaintiff's RFC is consistent with Reasoning Level
    Two, but is not consistent with Reasoning Level Three.") (citing

15  Zavalin); Lewis v. Colvin, 2016 WL 397626, at *5 (E.D. Cal. Feb.
    2, 2016) ("[W]ork involving simple instructions and simple,

16  repetitive tasks . . . seem[s] to comport with the requirements
    of Level 2 Reasoning."); see also Rounds v. Comm'r, 795 F.3d

17  1177, 1183 n.6 (9th Cir. 2015) (citing Zavalin and noting that
    "[u]npublished decisions of panels of this Court and opinions

18  from some of our sister circuits have concluded that an RFC
    limitation to 'simple' or 'repetitive' tasks is consistent with

19  Level Two reasoning.").

20      The VE opined that a hypothetical individual with
    Plaintiff's education and work experience who was limited to

21  simple, repetitive tasks and required access to a restroom up to
    10 percent of the work day on a continual basis could work as a

22  housekeeper, retail marker, or janitor.   (AR 69-70).   Pursuant to
    the Dictionary of Occupational Titles, a housekeeper requires

23  Level 1 Reasoning:   "Apply commonsense understanding to carry out
    simple one- or two-step instructions.   Deal with standardized

24  situations with occasional or no variables in or from these
    situations encountered on the job." DICOT 323.687-014.   A retail

25  marker or janitor requires Level 2 Reasoning:   "Apply commonsense
    understanding to carry out detailed but uninvolved written or

26  oral instructions.   Deal with problems involving a few concrete
    variables in or from standardized situations." DICOT 209.587-034

27  (retail marker); DICOT 381.687-018 (janitor).   Accordingly, the
    positions identified by the VE are consistent with the reasoning

28  abilities courts have found necessary for the performance of
    simple, repetitive tasks.

                                    34

would be inconsistent with the opinions of every other psychological examiner, discussed above, as well as Plaintiff's education and work history. Accordingly, the ALJ correctly assessed Plaintiff's mental impairments in determining her RFC.

### b. Restroom Breaks

Plaintiff argues that the RFC allowing Plaintiff access to a restroom during routine breaks amounts to no limitation at all, because "every worker in any job is allowed to go to the restroom during a routine work break." (Pl.'s Mem. at 10). Specifically, Plaintiff argues that "[n]othing in the ALJ's RFC finding encompasses or reflects plaintiff's need for random and extended restroom breaks and is therefore inadequate and incomplete." (Id. at 11-12). However, the ALJ's step 5 determination is expressly based on an RFC providing for "more flexibility with restroom breaks provided the individual was not off task more than 10% of the workday." (AR 23). This "up to 10 percent of the workday" limitation was also included in the hypotheticals presented to the VE at the hearing. (AR 68-77).

The RFC allowing Plaintiff additional bathroom breaks up to 10 percent of the workday is consistent with the medical record. On July 7, 2007, gastroenterologist Dr. Mize noted that Plaintiff reported having a bowel movement "once or twice a day" and that her abdominal symptoms improved with medication. (AR 284). On November 17, 2010, Plaintiff reported having problematic morning bowel movements to Dr. Zachrich, who prescribed Miralax. (AR

348).    A  few  weeks  later,  Plaintiff  reported  significant
improvement and easy daily bowel movements since regularly taking
Miralax.    (AR   337).    In   February   and   August   2011,
gastroenterologist  Dr.  Nastaskin  noted  that  Plaintiff's  GI
symptoms "globally improved" since November 2010 and her symptoms
were  "very  manageable."    (AR  319-22).    Although  Plaintiff
testified  at  the  hearing  that  she  had  on  average  four  to  six
bowel  movements  a  day  ranging  from  15  to  45  minutes,  the  ALJ
pointed  out  that  the  medical  record  does  not  support  these
allegations.    (AR  55-56).    No  treating  or  examining  physician
recorded  complaints  that  Plaintiff  would  regularly  experience
excessively  frequent  or  long  bowel  movements  while  actively
managing  her  symptoms  through  medication  and  diet.

     At   the   hearing,   the   ALJ's   hypotheticals   to   the   VE
encompassed  both  jobs  allowing  only  restroom  use  during  routine
work breaks and restroom use in excess of routine work breaks:

     Q:  Assume  a  hypothetical  individual,  currently
     closely approaching advanced age, with more than a high
     school  education,  same  past  work  experience  who's
     limited to simple, repetitive tasks and requires access
     to   a   restroom   during   routine   breaks.    Can   that
     individual perform the past work as a weigh master?
     A:   I believe so, your honor.
     Q:   And  in  the  performance  of  that  position,  do  you
     have  an  opinion  on  how  many  breaks  in  excess  of  the

36

1    routine breaks one might take on average to use the

2    restroom?

3    A:   Well.

4    Q:   If it was limited to less than 10 minutes?

5    A:   I think that position would be similar to working

6    with the public where your absence would be noted if

7    there were trucks coming through and you were the one

8    person there to weigh them.

9    Q:   Okay.

10   A:   I would say if you had no trucks coming through,

11   you could possibly make a quick run to the restroom,

12   but to leave the work site if you had trucks coming

13   through I think it would be very difficult.

14   Q:   And in particular the testimony that she would be

15   absent for 15 to 30 minutes.  Is that a time that would

16   be disruptive to this job?

17   A:   I believe it would be.

18   Q:   Are there other light, are there other jobs that

19   could accommodate more frequent absences?

20   A:   I think jobs that could more readily accommodate

21   those absences would be the position of housekeeper in

22   a hotel and motel, you pretty much work independently

23   if you are able to keep your production and get your

24   rooms done during the day.  I believe you could, it

25   would depend on the extent of absences from the

26   worksite.   If it got to the point where it was

27   interfering with productivity, I'm going to say in

28   excess of 10 percent on a continual basis, I think that

1    would eventually interfere with any job, but depending

2    on the degree housekeeper, the DOT is 323.687-014, it's

3    classified as light work unskilled, an SVP of 2.   In

4    the region defined as the State of California, we see

5    approximately 2,430, national economy approximately

6    6,292.   Also the position of marker in the retail

7    trade, the DOT is 209.587-034, classified as light work

8    unskilled, an SVP of 2.   In the region, approximately

9    9,754, national economy 313,723.

10    Q:   And is it the only light work that would have some

11    flexibility or are there medium exertional jobs that

12    would also have that flexibility?

13    A:   Probably a position of janitor would be similar to

14    housekeeper, you would have more accommodation.   That

15    is medium unskilled and an SVP of 2.   The DOT is

16    381.687-018.   In the region, approximately 22,049.

17    National economy, 130,556.

18    Q:   And just to clarify, and I know it is difficult to

19    quantify, but you're saying there is some flexibility

20    in that they are working independently but if the

21    absence to use the restroom is in excess, those

22    absences that are in excess of the routine absences

23    would prevent work for 10 percent or more of the day,

24    then it would preclude the job?

25    A:   I think if it got to the point where you were

26    nonproductive for more than 10 percent of the day,

27    consistently, and the employer became aware of it, it

28    could eventually interfere.   If you could somehow

1        structure the positions where you could get your work

2        done, which means sometimes you have to work more

3        rapidly to take the restroom breaks, I don't have a

4        black and white answer.

5        Q:    Right.

6        A:    It would depend on how it overall impacted your

7        ability to get that job done.

8        Q:    So the ultimate test is production on those jobs?

9        A:    I believe so, getting the job done consistent with

10       competition.

11

12  (AR 68-70).

13

14       Plaintiff's argument that the RFC limits Plaintiff to

15  restroom use during only routine work breaks misconstrues the

16  record.  Moreover, Plaintiff has not argued that limiting her to

17  restroom use outside of normal work breaks up to 10 percent of

18  the workday would not accommodate even the most extreme

19  allegations of needing to use the restroom 4 to 6 times a day.

20  As Plaintiff's appeal of the ALJ's decision to the Appeals

21  Council notes, this limitation may allow Plaintiff up to 48

22  minutes of additional bathroom breaks outside of routine work

23  breaks.    (AR 276-277).    Nothing in the record supports

24  Plaintiff's contention that this limitation is inadequate.

25  \\

26  \\

27  \\

28  \\

39

1              c.    Alcohol-Related Limitations

2

3       Plaintiff correctly points out that the ALJ's explanation of

4  her RFC determination does not specifically define "limitations

5  related to alcohol use." (Pl.'s Mem. at 12; AR 20-22). However,

6  earlier in the opinion the ALJ specifically discussed Dr.

7  Taylor's evaluation and findings of alcohol-related functional

8  limitations. The ALJ noted that Dr. Taylor opined Plaintiff "had

9  no work-related limitations other than no work at heights or

10 climbing ladders, no driving, and no operation of moving

11 machinery, all secondary to probable alcohol ingestion." (AR

12 17). Plaintiff does not dispute the commonsense reading that

13 these are the functional "limitations related to alcohol use"

14 described in the RFC.

15

16      Although the ALJ did not include these specific limitations

17 in the hypotheticals posed to the VE, reference to the DOT shows

18 that this error was harmless. Generally, the DOT is considered

19 the "best source" for determining how a job is generally

20 performed. See Pinto v. Massanari, 249 F.3d 840, 845-46 (9th

21 Cir. 2001). Of the four jobs discussed, the alcohol-related

22 limitations would only possibly preclude work as a janitor,

23 which, according to the DOT, may require occasional climbing or

24 the operation of an industrial truck to transport materials

25 within a plant. See DOT 381.687-018. The jobs of weigher,

26 housekeeper, and retail marker do not require working at heights,

27 climbing ladders, driving, or operating moving machinery. See

28 DOT 222.387-074, 323.687-014, 209.587-034. Even if it was error

40

for the ALJ to determine that Plaintiff could perform work as a janitor at step five, that error was harmless because the other three jobs not precluded by the alcohol-related limitations exist in sufficient numbers in the national economy.   See Tommasetti, 533 F.3d at 1042 (where ALJ concludes claimant can perform job inconsistent with RFC, but also makes alternative finding regarding job that is consistent with RFC, error is harmless).

**B.   The ALJ Provided Specific And Legitimate Reasons To Reject Dr. Zachrich's Opinion**

Next, Plaintiff contends that the ALJ improperly rejected the opinions of Plaintiff's treating physician. (Pl.'s Mem. at 13-15). The Court disagrees and finds that the ALJ provided specific and legitimate reasons for rejecting Dr. Zachrich's opinion.

Social Security regulations require the ALJ to consider all relevant medical evidence when determining whether a claimant is disabled.   20 C.F.R. §§ 404.1520(b), 404.1527(c), 416.927(c). Where the Agency finds the treating physician's opinion of the nature and severity of the claimant's impairments well-supported by accepted medical techniques and is not inconsistent with the other substantive evidence in the record, that opinion is ordinarily controlling.   20 C.F.R. § 404.1527(c)(2); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

\\

\\

41

Nevertheless, the ALJ is also "responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see also Tommasetti, 533 F.3d at 1041 ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."). Findings of fact that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); see also Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."); Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.") (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)). An ALJ need not address every piece of evidence in the record, but only evidence that is significant or probative. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2006).

Furthermore, "[t]he treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and whether it is consistent with other evidence in the record. See 20 C.F.R. § 404.1527. "The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." Andrews, 53 F.3d at 1041 (citing Magallanes, 881 F.2d at 751). To reject the uncontroverted

42

opinion of plaintiff's physician, the ALJ must present clear and convincing reasons for doing so. <u>Andrews</u>, 53 F.3d at 1041. Where, as here, the treating physician's opinion is contradicted by other doctors, the Commissioner may reject the opinion by providing "specific and legitimate reasons" for doing so that are supported by substantial evidence in the record. <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (citing <u>Reddick</u>, 157 F.3d at 725).

An ALJ is free to disregard conclusory opinions that lack support in the record. <u>See, e.g.</u>, <u>Batson v. Comm'r of Soc. Sec.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings); <u>Crane v. Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctor's opinion because opinion consisted of conclusory and unexplained check-off reports).

Here, the ALJ cited several specific and legitimate reasons supported by the record for giving minimal weight to Dr. Zachrich's opinion. First, the ALJ noted that Dr. Zachrich's opinion that Plaintiff was precluded from employment is not well supported by the record. (AR 21). This finding is supported by the fact that Plaintiff worked at the deli at Vons during most of her years of treatment with Dr. Zachrich. Her symptoms did not appear to materially change over time and in fact, appeared to improve with proper medication and treatment. Accordingly, her

1  symptoms did not preclude work as she worked steadily during the

2  times she complained of symptoms to Dr. Zachrich.

3

4       Second, the ALJ noted that Dr. Zachrich's opinion was

5  "internally inconsistent" with his treatment notes.  (AR 21).

6  Again, as the doctor's treatment notes reflect steady work and

7  improvement in Plaintiff's symptoms, this reason is specific and

8  legitimate.

9

10      The ALJ properly gave minimal weight to Dr. Zachrich's

11  opinion because it conflicted with other medical evidence in the

12  record.   The ALJ possesses the sole discretion to resolve

13  conflicts between conflicting medical evidence.  See, e.g.,

14  Andrews, 53 F.3d at 1041 ("Where the opinion of the claimant's

15  treating physician is contradicted, and the opinion of a non[-

16  ]treating source is based on independent clinical findings that

17  differ from those of the treating physician, the opinion may

18  itself be substantial evidence; it is then solely the province of

19  the ALJ to resolve the conflict.").  An ALJ is not bound by an

20  expert medical opinion on the ultimate question of disability.

21  Tommasetti, 533 F.3d at 1041 (citing Lester v. Chater, 81 F.3d

22  821, 830-31) (9th Cir. 1995)); 20 C.F.R. § 404.1527(d)(1).

23

24      Here, the ALJ observed that Dr. Zachrich's conclusion

25  regarding the purportedly debilitating effects of Plaintiff's

26  gastrointestinal condition conflicted with the opinions of

27  treating gastroenterologists Dr. Mize and Dr. Nastaskin.  (See

28  generally AR 17-22).  Both specialists concurred that Plaintiff's

symptoms were manageable with medication, improved over time, and not serious enough to require surgery or more aggressive treatment. (AR 281-282, 319-322). The ALJ permissibly found Dr. Nastaskin's opinion "the most persuasive with regard to gastrointestinal/abdominal complaints." (AR 21); see 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Dr. Zachrich's conclusion that Plaintiff was completely disabled also conflicted with the treatment notes of Plaintiff's gynecologist, Dr. Wiltchik, which noted only occasional abdominal pain amid visits when Plaintiff made no complaints or reported that she was doing well. (AR 286, 290, 292, 295).

The fact that Dr. Zachrich's conclusion conflicted with his own treatment notes provided another valid basis upon which to reject his opinions. See Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (holding that the ALJ properly rejected a treating physician's testimony in favor of an examining physician's statements because the treating physician's "extensive conclusions regarding [claimant's] limitations [were] not supported by his own treatment notes"); see generally 20 C.F.R. § 404.1527(c)(2), (d)(2); see also Tommasetti, 533 F.3d at 1041 (finding that ALJ properly discredited doctor's opinion where doctor's responses to questionnaire were inconsistent with doctor's own medical records). Dr. Zachrich's treatment notes consistently note that Plaintiff's symptoms were manageable with

medication.  (AR 359, 366, 414, 419, 422, 426, 434).  His treatment notes also reflect that the worst of Plaintiff's symptoms, like problematic morning bowel movements, occurred before she started regularly taking Miralax.  (AR 337, 348).  The ALJ was entitled to discredit Dr. Zachrich's conclusion that Plaintiff is precluded from employment based on the inconsistency with his notes reflecting improvement and management of symptoms.

The Court therefore disagrees with Plaintiff's contention that the ALJ improperly rejected Dr. Zachrich's opinion that Plaintiff was precluded from any employment.  Accordingly, the Court finds that the ALJ gave proper weight to Dr. Zachrich's opinions and arrived at an appropriate RFC.

**C.  The ALJ's Failure To Discuss Plaintiff's Husband's Third Party Function Report Was Harmless Error**

Plaintiff contends that the ALJ "clearly erred" by failing to address or even mention the third party function report submitted by Plaintiff's husband.  (Pl.'s Mem. at 15-17).  Although the Court agrees that ALJ should have addressed the Plaintiff's husband's testimony, the Court finds this error was harmless because consideration of the report would not have altered the ultimate nondisability determination.

The ALJ is required to consider the lay testimony provided by family members and friends.  Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009).  Such testimony cannot be disregarded

without comment.  Bruce, 557 F.3d at 1115.  If an ALJ fails to consider lay testimony, "a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout v. Comm'r, 454 F.3d 1050, 1056 (9th Cir. 2006).

Here, Plaintiff's husband, Rick Cassidy, submitted a third party function report dated December 28, 2011.  (AR 219-228).  In that report, Mr. Cassidy stated that Plaintiff was unable to work because her illness made her unreliable for work.  (AR 220-221).  Although he did not state the precise frequency and duration of Plaintiff's bowel movements, Mr. Cassidy noted that she "often goes from toilet to bed over and over."  (AR 221).  Despite concluding that Plaintiff had a debilitating illness, Mr. Cassidy described Plaintiff's daily activities as including caring for their pets, cooking her meals, performing household and outdoor chores on an inconsistent basis, shopping for food, watching television and listening to music, and occasionally socializing with friends or family.  (AR 220-225, 227).

The ALJ failed to mention Mr. Cassidy's written lay testimony.  That testimony, however, did not describe any limitations beyond those Plaintiff herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons.  Mr. Cassidy's testimony merely corroborated Plaintiff's need for frequent, unplanned bathroom breaks, which the ALJ accounted for in the RFC to the extent it

1   was supported by the medical record.  Mr. Cassidy's report offers

2   no additional detail about how Plaintiff's medical conditions

3   limit her ability to perform in a working environment.  Like Dr.

4   Zachrich, Mr. Cassidy asserts that, contrary to medical evidence,

5   Plaintiff's bowel problems are totally disabling.  To the extent

6   Mr. Cassidy claimed Plaintiff's impairments affect her postural

7   abilities, this testimony is contradicted by medical evidence and

8   Plaintiff's own testimony.  (AR 57-58, 225-226, 326-327).  As a

9   whole, Mr. Cassidy's report offers no opinions or observations

10  not otherwise considered by the ALJ.  Accordingly, the ALJ's

11  error was harmless.  See Molina v. Astrue, 674 F.3d 1104, 1122

12  (9th Cir. 2012) ("Because the ALJ had validly rejected all the

13  limitations described by the lay witnesses in discussing

14  [plaintiff]'s testimony, we are confident that the ALJ's failure

15  to give specific witness-by-witness reasons for rejecting the lay

16  testimony did not alter the ultimate nondisability determination.

17  Accordingly, the ALJ's error was harmless.").

18

19  **D.    The ALJ Provided Specific, Clear, And Convincing Reasons To**

20  **       Reject Plaintiff's Testimony**

21

22      Plaintiff argues that the ALJ failed to cite specific,

23  clear, and convincing reasons to discredit her testimony.  (Pl.'s

24  Mem. at 17-24).  Specifically, Plaintiff contends that the ALJ's

25  reliance on Plaintiff's work ethic, daily activities,

26  inconsistent statements in the record, and limited and

27  conservative treatment were not specific, clear, and convincing

28  reasons for discrediting Plaintiff's testimony.  (Id.).  The

48

1    Court   disagrees   and   finds   that   the   ALJ   properly   rejected

2    Plaintiff's testimony.

3

4        When assessing a claimant's credibility regarding subjective

5    pain or intensity of symptoms, the ALJ must engage in a two-step

6    analysis.   Molina, 674 F.3d at 1112.   Initially, the ALJ must

7    determine  if  there  is  medical  evidence  of  an  impairment  that

8    could  reasonably  produce  the  symptoms  alleged.   Id.  (citation

9    omitted).   If such evidence exists, and there is no evidence of

10   malingering, the ALJ must provide specific, clear and convincing

11   reasons for rejecting the claimant's testimony about the symptom

12   severity.   Id. (citation omitted).   In so doing, the ALJ may

13   consider the following:

14

15       [One,]  [the]  ordinary  techniques  of  credibility

16       evaluation,  such  as  the  claimant's  reputation  for

17       lying,  prior  inconsistent  statements  concerning  the

18       symptoms,  and  other  testimony  by  the  claimant  that

19       appears  less  than  candid;  [two,]  [the]  unexplained  or

20       inadequately  explained  failure  to  seek  treatment  or  to

21       follow a prescribed course of treatment; and [three,]

22       the claimant's daily activities.

23

24   Smolen, 80 F.3d at 1284 (brackets added); Tommasetti, 533 F.3d at

25   1039.

26

27       Further, the ALJ must make a credibility determination with

28   findings that are "sufficiently specific to permit the court to

49

1    conclude that the ALJ did not arbitrarily discredit [plaintiff's]

2    testimony." Tommasetti, 533 F.3d at 1039 (citation omitted).

3    Absent  affirmative  evidence  of  malingering,  an  adverse

4    credibility finding must be based on "clear and convincing

5    reasons." Carmickle, 533 F.3d at 1160. Although an ALJ's

6    interpretation of a claimant's testimony may not be the only

7    reasonable one, if it is supported by substantial evidence, "it

8    is not [the court's] role to second-guess it." Rollins, 261 F.3d

9    at 857 (citing Fair, 885 F.2d at 604).

10

11       The ALJ considered evidence in all of these categories and

12   rendered specific credibility findings that led her to reject

13   Plaintiff's testimony.  The ALJ properly considered evidence

14   indicating that Plaintiff's symptoms were not as severe as

15   alleged, such as her testimony that her gastrointestinal

16   condition was "uncontrollable" which was inconsistent with

17   medical records stating her condition was well-regulated by

18   medication. (See AR 86). At the hearing, the ALJ pointed out

19   numerous times that the medical records did not corroborate

20   Plaintiff's reports of excessively frequent and urgent bowel

21   movements.  (See AR 56, 84-86).  The ALJ also noted that

22   Plaintiff's treating and examining physicians often noted

23   Plaintiff's reports of doing well and symptom management with

24   medication. (AR 18, 20-22).

25

26       Moreover, as the ALJ also observed, Plaintiff's testimony

27   regarding her daily activities weakened her credibility. (AR

28   22).  The evidence reflects that Plaintiff is able to exercise

daily, perform light yard work, do laundry, take care of her pets, perform household chores, visit with neighbors, wash dishes, and taker her brother-in-law to bi-weekly mental health appointments. (AR 22). The ALJ also pointed out that Plaintiff testified she stopped taking Miralax because it caused anal leakage, but the record indicates that Plaintiff was pleased with the efficacy of the medication and did not report any side effects. (AR 22). The ALJ noted that failure to regularly take medication was inconsistent with allegations of disabling pain and constipation. (AR 22).

Finally, the ALJ noted that Plaintiff's treating physicians found her symptoms "very manageable" with limited and conservative treatment. (AR 22). Both gastroenterology specialists determined that surgery was not necessary or of "questionable" benefit (Dr. Maze at AR 282; Dr. Nastaskin at AR 320) because Plaintiff could adequately manage her symptoms with medication. (AR 282, 320). Plaintiff herself declined surgery because her symptoms were "very manageable." (AR 320). Such conservative treatment is inconsistent with the level of severity of symptoms that Plaintiff alleges.

In sum, there are legally sufficient, record-based reasons for the ALJ to have declined to credit Plaintiff's subjective statements in their entirety. For these reasons, the ALJ's ultimate determination that Plaintiff's testimony was not credible is valid.

# VIII.

## CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.


DATED: March 7, 2016                    _____/S/_____
                                        SUZANNE H. SEGAL
                                        UNITED STATES MAGISTRATE JUDGE




## NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS/NEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**